Stephen M. Sansom (#10678)
Brandon T. Christensen (#16420)
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT  84101
Tel: (801) 799-5897
*smsansom@hollandhart.com*
*btchristensen@hollandhart.com*

Anthony R. Zeuli *(Pro Hac Vice pending)*
*tzeuli@merchantgould.com*
Thomas Johnson *(Pro Hac Vice pending)*
*tjohnson@merchantgould.com*
MERCHANT GOULD P.C.
2200 Fifth Street Towers
150 South Fifth Street
Minneapolis, MN  55402-4247
Tel: (612) 332-5300
Fax: (612) 332-9081

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH SOUTHERN REGION OF THE CENTRAL DIVISION

| | |
|---|---|
| CRYSTAL LAGOONS U.S. CORP. AND CRYSTAL LAGOONS TECHNOLOGIES INC., <br><br> Plaintiffs, <br><br> vs. <br><br> DESERT COLOR MANAGER LLC, DESERT COLOR ST. GEORGE LLC, AJ CONSTRUCTION, INC., TRI-STATE VENTURES, LLC d/b/a CAREFREE HOMES – UTAH, COLE WEST HOME LLC, HOLMES HOMES, INC., SULLIVAN HOMES LLC, and PACIFIC AQUASCAPE INTERNATIONAL, INC., <br><br> Defendants. | **COMPLAINT** <br><br> **(REDACTED VERSION – EXHIBIT 6 FILED UNDER SEAL)** <br><br> Case No. 2:20-cv-00851-BSJ <br><br> Judge Bruce S. Jenkins <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Crystal Lagoons U.S. Corp. and Crystal Lagoons Technologies Inc. ("Crystal Lagoons"), through their undersigned attorneys, for their Complaint against Defendants Desert Color Manager LLC, Desert Color St. George LLC (collectively "Desert Color"), AJ Construction, Inc. ("AJ Construction"), Tri-State Ventures, LLC d/b/a Carefree Homes-Utah ("Carefree Homes"), Cole West Home LLC ("Cole West"), Holmes Homes, Inc. ("Holmes"), Sullivan Homes LLC ("Sullivan") (collectively the "Builder Defendants"), and Pacific Aquascape International, Inc. ("Pacific Aquascape") (collectively "Defendants") allege as follows:

## THE PARTIES

1.      Crystal Lagoons U.S. Corp. is a Delaware corporation with its principal place of business at 2 Alhambra Plaza, PH1B, Coral Gables, FL 33134.

2.      Crystal Lagoons Technologies Inc. is a Delaware corporation with its principal place of business at 1209 Orange Street Wilmington, New Castle, DE 19801.

3.      On information and belief, Desert Color Manager LLC is a Utah corporation with its principal place of business at 730 N 1500 W, Orem, UT 84057.

4.      On information and belief, Desert Color St. George LLC is a Utah corporation with its principal place of business at 730 N 1500 W, Orem, UT 84057.

5.      On information and belief, AJ Construction, Inc. is a Utah corporation with its principal place of business at 265 West Tabernacle, #200, St. George, UT 84770.

6.      On information and belief, Tri-State Ventures, LLC d/b/a CareFree Homes – Utah is a Texas corporation with its principal place of business at 2693 S 120 E, St. George, UT 84790.

7.      On information and belief, Cole West Home LLC is a Utah corporation with a

principal place of business at 1222 West Legacy Crossing Blvd, Suite 6, Centerville, UT 84014.

8.      On information and belief, Holmes Homes, Inc. is a Utah corporation with a principal place of business at 126 West Sego Lily Drive, Suite 250, Sandy, UT 84070.

9.      On information and belief, Sullivan Homes LLC is a Utah corporation with a principal place of business at 558 East Riverside Drive, Suite 102, St. George, UT 84790.

10.     On information and belief, Pacific Aquascape International, Inc. is a Utah corporation with its principal place of business at 17520 Newhope Street, #120, Fountain Valley, California 92780.

## JURISDICTION

11.     This is an action for trademark and trade dress infringement, unfair competition, and false advertising arising under the Lanham Act, 15 U.S.C. §§ 1051, *et seq*., violations of the Utah Truth in Advertising Act, UT Code §§ 13-11a-1 *et seq.*, breach of contract under Utah state law, and common law conversion and unjust enrichment.

12.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1338(a), 1338(b), and 1367.

13.     This Court has personal jurisdiction over Defendants because each Defendant resides in Utah or has a principal place of business located in Utah, or both.

14.     Venue is proper in this District under 28 U.S.C. §1391 because all Defendants reside in this district, have their principal places of business here, or both. In addition, a substantial part of the events giving rise to the claims occurred in this district.

## BACKGROUND

15.     Crystal Lagoons has developed and patented a technology that allows building and maintaining large man-made lagoons with high transparency and excellent water quality at

low costs, and that is changing the lifestyle of people worldwide. Crystal Lagoons technology is one of the most innovative and important technologies of recent years in the world. With over 2,000 patents in 190 countries, Crystal Lagoons is responsible for more than 70 projects already in operation and in construction stages, and more than 1,000 projects globally in negotiation and planning stages worldwide, bringing beach life to every corner of the world.

16.     Inventor Fernando Fischmann, a real estate developer and biochemist, had started planning a second-home real estate development called San Alfonso del Mar, in a small town on Chile's central coast. Although the site had a fantastic view of the sea and was close to Santiago (Chile's capital), the local shoreline was unattractive due to cold-water temperatures, as well as the dangerous waves and undercurrents, which posed a risk to bathers, who were forbidden to swim or practice watersports in the area. Mr. Fischmann envisioned creating an enormous lagoon 0.6 miles long and 20 acres in surface area, with crystalline turquoise waters that could provide a safe way to swim and enjoy watersports in a clean and family-friendly environment.

17.     Mr. Fischmann traveled around the world to the United States, Australia, Germany, and other countries looking for a company that was able to turn his vision into a reality, and he was repeatedly told that the only technology that existed to provide recreational water bodies was conventional swimming pool construction and operation technology and that it was not viable to have such large water bodies with excellent water quality and transparency, and he would never succeed in creating such a technology.

18.     It is important to note that the San Alfonso del Mar lagoon envisioned by Mr. Fischmann is equivalent to 6,000 residential pools, and therefore using traditional pool construction and operation technologies would require, for example, a complete concrete shell for creating the lagoon structure and expensive coatings, more than 2,000 inlets, and 6,000 doses

of chlorine and 6,000 filters to operate, making such a structure unviable technically and economically.

19.     Mr. Fischmann, a trained biochemist, conducted research for more than 7 years to develop a technology that allowed building a low cost structure to maintain such a large water body, and also for maintaining the water with an innovative water treatment technology that uses up to 100 times less chemicals and up to 50 times less electricity than conventional swimming pool technology. This state-of-the-art technology allows creating and operating recreational water bodies of any size with excellent water quality and transparency at low costs.

20.     Specifically, Mr. Fischmann invented a new structure, with specific technical features and elements, in order to create a low-cost structure to contain large water bodies used for recreational purposes, which was first used in the construction of the first lagoon at San Alfonso del Mar. This technology included, among others, the use of a plastic liner that is able to be thoroughly cleaned, instead of a complete concrete shell, where the liner is mostly installed directly over soil or compacted sand. This had not been done anywhere else in the world to create large man-made lagoons with crystalline water similar to tropical seas for recreational purposes. Further, Mr. Fischmann invented a new water treatment technology that uses flocculation to settle particles and contaminants to the bottom of the large water bodies and removing such settled material with a bottom cleaning system.

21.     Over the years, Mr. Fischmann has invented many technologies, including systems and methods for water treatment, bottom cleaning, efficient filtration systems, business methods, localized disinfection systems, construction methods, hydraulic systems and techniques, among others, creating a 2,000+ patent portfolio worldwide.

22.     Crystal Lagoons technology is one of the most innovative and sought-after

technologies of recent years in the world. It has received numerous awards and two Guinness Book of World Records. It turned a mirage into reality: creating beautiful clear water bodies for bathing and the practice of water sports, bringing beach life to all corners of the world. These man-made lagoons are not only used for swimming and bathing, but also for practicing water sports, such as kayaking, sailing, rowing, and windsurfing, in designated areas within the lagoon.

23.     On information and belief, all large man-made lagoons with crystal clear waters used for direct contact recreational purposes, such as swimming, bathing and also for the practice of water sports around the world are built, operated, and maintained with Crystal Lagoons' technology.

24.     Crystal Lagoons has developed and patented various technologies that have enabled a change in peoples' lifestyle around the world. Today they have a portfolio of over 2,000 patents in 190 countries around the world. Their scientific efforts are also focused on the development of a wide variety of industrial applications that allow them to help solve pressing global sustainability issues, which include water and energy scarcity, as well as environmental degradation.

25.     Mr. Fischmann's revolutionary innovations for building and maintaining large man-made lagoons with excellent water quality at low costs and in a sustainable manner allowed for the first lagoon in San Alfonso del Mar and paved the way for the rest of the world, having today more than 70 projects in different stages of operation and construction, and more than 1,000 projects in planning and negotiations stages, with lagoons of more than 30 acres of water surface. Crystal Lagoons has projects in the United States, South Africa, Dubai, Indonesia, Thailand, Egypt, Spain, Turkey, Vietnam, Chile, Peru, Bolivia, Paraguay, Argentina, among other countries. Some examples can be seen below from photos of projects using Crystal

Lagoons' technology:

**Figure 1: Epperson Project, Florida (7 acres)**



**Figure 2: Epperson Project, Florida (7 acres)**



**Figure 3: Photograph of Lago Mar Project, Texas (12 acres)**



**Figure 4: Photograph of Lago Mar Project, Texas (12 acres)**



**Figure 5: Photograph of the Balmoral project, Texas (2 acres)**





**Figure 6: Photograph of the Sole Mia Project, Florida (7 acres)**



26.     The following is a web link to a video of the Epperson Project, located in Florida and the Lago Mar project, located in Texas, which shows the concept and technology from Crystal Lagoons, providing clear differentiation from a conventional swimming pool. Link Epperson Project:   https://vimeo.com/445038143/5896695be3.   Link Lago Mar Project: https://vimeo.com/445038144/95ef018e89.

27.     This innovation has allowed developers to create real estate projects where residents have access to beach life at the doorsteps of their home, enjoying the man-made crystalline lagoon far from the sea, and recently, through his latest concept of the Public Access Lagoons, bringing beach life to an urban setting having a ticketed access to the lagoon complex, changing the lifestyle of people in cities. Instead of having to drive long hours or fly to a tourist beach destination, the nearby population will be able to visit the beach through the Public Access Lagoon™ or PAL™ concept just steps away from their homes, having access to several recreational, commercial, and cultural facilities and experiences, such as restaurants, practicing water sports, concerts, among others, changing the lifestyle of cities around the world.

28.     Similar to the beginning of public parks 200 years ago, when the first city parks were created in England bringing natural forest to cities, this innovation brings a piece of the ocean to cities, incorporating the beach into an urban context.

29.     This new Public Access Lagoon or PAL concept has gained so much drive that from October 2019 to date 130 projects around the world have been signed as part of Master Agreements with estimated royalties for Crystal Lagoons that exceed US $3.8 billion.

30.     The importance of Crystal Lagoons' technology is further backed by many facts. First, Crystal Lagoons became the first Chilean "Unicorn" only one and half years after its

creation. "Unicorns" are start-up companies valued in over $1 billion dollars. Secondly, Mr. Fischmann has been honored many times with prestigious international awards, such as Ernst & Young's "Entrepreneur of the Year," "Innovator of the Year," and "Businessman of the Year," being the only executive to receive these three awards. In 2016, he received the Innovation Stevie Award in Italy, also known as the Oscars of the business world and previously awarded to Steve Jobs and Jeff Bezos, and the "Real Innovator Award," by the London Business School, as well as the "Green Apple Award" received in the House of Commons at Westminster Palace, London, among many others. Mr. Fischmann is also director of the German Institute for applied science Fraunhofer Institute FCR. Thirdly, Mr. Fischmann has also been keynote speaker at events organized by the Harvard Business School, MIT, Duke, Babson College, London Business School, Berkeley, among many other events and was recently interviewed by Stanford University radio for 40 minutes. Mr. Fischmann has also been given the O-1 visa in the U.S., for Individuals with Extraordinary Ability or Achievements. All of this as a result of the impact of his technologies on the lifestyle of people around the world.

31.     Finally, in January of 2020, Crystal Lagoons Technologies Inc. (holder of Crystal Lagoons' US intellectual property portfolio) became incorporated as a U.S. company, which required a valuation of its Intellectual Property for tax purposes, resulting in a value of more than US $3 billion. Today, the company is a technology company with patents in over 190 countries, where all Crystal Lagoons' patents have been granted in 100% of the countries and territories where they have been examined.

## CRYSTAL LAGOONS' INTELLECTUAL PROPERTY

32.     Crystal Lagoons Technologies, Inc. owns the rights in Crystal Lagoons' intellectual property in the U.S. including patents, trademarks, trade dress and copyrights.

Indeed, Crystal Lagoons and related entities own more than 2,000 patents worldwide in more than 190 countries and more than 350 designs to protect its valuable and proprietary technology. Crystal Lagoons reserves the right to assert claims for relief due to Defendants actions regarding these patents. Crystal Lagoons U.S. Corp is the exclusive licensee of Crystal Lagoons' intellectual property, including the asserted trademarks, and has the exclusive right to sub-license the intellectual property in the United States.

33.     The name "Crystal Lagoons®" has become famous and synonymous with the crystal clear man-made lagoons built using Mr. Fischmann's innovative technology. Throughout the world the name "Crystal Lagoons®" evokes images of man-made lagoons with crystalline blue, crystal-clear waters lapping on white sand beaches. This is no less true in the United States, where more than 6 lagoons powered by Crystal Lagoons' technology are already in operation and more than 30 are under contract or construction.

34.     As such, Crystal Lagoons has filed for and obtained numerous U.S. trademarks on the name "Crystal Lagoons®" and related terms, covering a wide range of goods and services. These include:

| Registration No. | Date of Registration | Trademark |
|---|---|---|
| 3,881,936 | November 30, 2010 | CRYSTAL LAGOONS |
| 5,312,449 | October 17, 2017 | CRYSTAL LAGOONS |
| 5,336,166 | November 14, 2017 | CRYSTAL LAGOONS WORLD'S TOP AMENITY |
| 5,454,097 | April 28, 2018 | CRYSTAL LAGOONS |
| 5,465,084 | May 8, 2018 | CRYSTAL LAGOONS |
| 5,551,251 | August 28, 2018 | CRYSTAL LAGOONS WORLD'S BEST AMENITY |
| 5,870,729 | October 1, 2019 | CRYSTAL LAGOONS |
| 5,927,101 | December 2, 2019 | THE BEACH BY CRYSTAL LAGOONS |
| 6,042,995 | April 28, 2020 | CRYSTAL LAGOONS |

35.     In addition, Crystal Lagoons has created a trade dress associated with the look and

feel of the lagoons powered by its innovative technology and its combined use with some of its immediate surroundings. Crystal Lagoons has developed this trade dress with the purpose that customers will instantly recognize that a project is developed with Crystal Lagoons technology without necessarily having to see the Crystal Lagoons trademark anywhere on the premises.

36.     The Crystal Lagoons' Trade Dress consists of the design and layout of an urban beach recreational complex. The urban beach recreational complex includes a man-made tropical-style lagoon with pristine clear waters, as in tropical seas, as its centerpiece, with the look and feel of a tropical lagoon, including a light colored, smooth bottom mostly covered with a plastic membrane and not painted concrete as in conventional swimming pools.

37.     Further, in Crystal Lagoons' Trade Dress, the edges of the lagoon are generally rounded and designed in curved shapes and geometries and the lagoon: (1) has at least one zero-entry zone that resembles a tranquil tropical beach; and (2) has a swimming zone and a water sports zone, which are not physically separated, instead the lagoon's deeper waters may be used for practicing water sports, while the sloped areas are mostly for bathing and swimming.

38.     The urban beach recreational complex also includes sandy beaches, recreational areas, and may include docks and/or piers. Beach areas feature elements that evoke a tropical beach, while also including sunshades.

39.     Crystal Lagoons' Trade Dress is non-functional, in that it is not essential to the use or purpose of the recreational water feature, and use of the Trade Dress does not affect the cost of creating a recreational water feature.

40.     An example of Crystal Lagoons' Trade Dress is reproduced below:



**Figure 7: Example of Crystal Lagoons' trade dress**

## <u>DEFENDANTS RELATIONSHIPS WITH ONE ANOTHER</u>

41.     Desert Color is a "master-planned community unlike any other" being developed in southern Utah. Its website mentions that it does not have a golf course. The "center piece" is a swimmable, multi-acre, man-made lagoon designed and being built by Pacific Aquascape. It is located in St. George, Utah.

42.     To provide more clarity, on information and belief, Pacific Aquascape provided the final design, engineering, and construction of the Desert Color lagoon, and Desert Color is selling houses/lots within its development, which have access to the Desert Color lagoon. Therefore, Pacific Aquascape designed and is building the lagoon, while Desert Color is commercializing the project's lagoon.

43.     The name "Desert Color®" is registered to Desert Color, LLC. Upon information and belief, Defendant Desert Color Manager LLC manages the Desert Color project, while Defendant Desert Color St. George LLC is the corporate owner of the development project itself.

44.     Defendant Pacific Aquascape is designing, overseeing construction, and will

provide maintenance of the "center piece" man-made lagoon.

45.     Desert Color has five builder affiliates: Defendants AJ Construction, Holmes Homes, Sullivan, Carefree Homes, and Cole West Homes:

**Figure 8: Extract from Desert Color Website**



# CRYSTAL LAGOONS' RELATIONSHIP
# WITH DEFENDANT DESERT COLOR

46.     Around June 2017, Crystal Lagoons was contacted by Desert Color about providing a Crystal Lagoons® lagoon for the Desert Color development to be located in St. George, Utah. Initially, the plan conceived by Desert Color included a mixed commercial district with the concept drawings showing at least 3 lagoons to be developed with Phase 1 including a 2.5 acre recreational lagoon.

**Figure 9: Images from Desert Color's website**



47.     As noted above, Crystal Lagoons has significant intellectual property including more than two thousand patents, as well as trademarks, trade dress and copyrights. Crystal Lagoons provides consultancy from the start of every project. It delivers the information needed

(including architectural services and basic and detailed engineering plans and specifications) for any local professional contractor to be able to execute the project without any problem. To ensure quality, specialized Crystal Lagoons professionals provide supervision of the construction, filling and implementation of the lagoon. They also train maintenance personnel to ensure the quality standards are followed. Furthermore, Crystal Lagoons supplies special equipment and additives and remotely controls the physicochemical variables of the water and the system's operating valves. This is so that it can ensure permanent compliance with high quality standards for its clients.

48.     To protect its proprietary intellectual property and business secrets, Crystal Lagoons requires every client to enter into a Non-Disclosure Agreement ("NDA") at the commencement of a project before providing sensitive information.

49.     On December 8, 2017, Crystal Lagoons and Desert Color signed an NDA. (*See* Exhibit 1.) The NDA contained a number of provisions meant to protect the parties' confidential information, ideas and innovations, and intellectual property.

50.     The NDA defined what the parties' considered to be "Confidential Information" as:

> [A]ll information (whether marked Confidential or not) in any media including, but not limited to, all rendering, sketches, drawings, economic proposals, business model, data, know-how, formulae, processes, designs, documents, software, programs, photographs and other material related to the dealings between the parties….

(Ex. 1, ¶ 1.) The NDA also included within the definition of Confidential Information "[a]ny information created by Recipient using any part of the Confidential Information." (*Id*.)

16

51.     The NDA prohibited the Recipient of Confidential Information from "publish[ing] or disclos[ing] Confidential Information (or any part) to any third party without prior written consent of the Disclosing Party." (*Id.*, ¶ 2.1.)

52.     The NDA specifically noted that it did not grant a license nor transfer any patents, copyrights, trademarks, ideas, brand or other intellectual or industrial property held by Crystal Lagoons or Crystal Lagoons' business group. (*Id.*, ¶7)

53.     The NDA also expressly stated that "[n]either Party shall use the other's name or trademark, unless authorized in writing. Recipient [Desert Color] may not imply or represent that it has any mandate or representation powers from the Disclosing Party [Crystal Lagoons]." (*Id.*, ¶ 8.) Additionally, the NDA bound the parties, "their affiliates, successors, and assigns." (*Id.*)

54.     Crystal Lagoons has never given Desert Color, or any of its affiliates, successors or assigns, written permission to disclose the details of its proposals to any third party or to use Crystal Lagoons' name or trademark in advertisements or promotional materials.

55.     As part of the initial process, Desert Color provided a preliminary plan to Crystal Lagoons of potential sites for lagoons based on initial concepts of the project. However, on or about January 1, 2018, Crystal Lagoons presented its first preliminary, proprietary concept to Desert Color, which included a single, large lagoon rather than three smaller lagoons. Desert Color's plan and Crystal Lagoons' initial proposal are reproduced below.

**Figure 10: First Proposal based on original concept**



56.    Shortly thereafter, on January 11, 2018, Desert Color made a public announcement about moving forward with the plan including an explicit reference to a "resort facility with crystal lagoons." (*See* Exhibit 2 (printout of: https://www.cedarcityutah.com/news/archive/2018/01/11/kss-plans-unveiled-for-master-planned-community-in-st-george-comprising-10000-new-residences/#.Xyg7HyhKhhG).)

57.    The very next day, in a January 12, 2018 email, Lisa Moore, Crystal Lagoons' Regional Director, warned Desert Color about using its trademarked name. Specifically, Ms. Moore stated: "That's great news about Weaver announcing the project at the Summit yesterday, as I hope this means we will get to continue to work together in incorporating our lagoon technology into your development. I will try and reach you by phone today as we need to discuss the sensitivities in announcing that you are working with Crystal Lagoons before we have a signed deal. Our company is very particular about this, so it's best/easier to discuss via phone." (Ex. 3, emphasis added).

58.    Crystal Lagoons and Desert Color continued working together through 2018. In March of 2018, Crystal Lagoons began working on, among other things, water study numbers for public relations purposes, a revenue model for including a public access lagoon at the Desert

18

Color site, and reworking terms for a royalty structure for the proposed lagoon. (Ex. 4.) Crystal Lagoons also undertook preliminary studies to ensure that its lagoon would meet Utah regulations for a swimmable body of water and began planning a Technical Tour for members of the Desert Color team. (Ex. 5.)

59.     By February 2019, Crystal Lagoons had put together a full Economic Proposal for Desert Color, which was accepted and signed by Desert Color on February 15, 2019 (Ex. 6). The Economic Proposal included proprietary details regarding construction costs, maintenance costs, and royalty rates associated with using Crystal Lagoons' intellectual property. Like Crystal Lagoons' Proposal, the information contained in the Economic Proposal was confidential and subject to the NDA. Desert Color and its affiliates accepted the Economic Proposal and continued to move forward.

60.     On March 6, 2019, after the Economic Proposal was accepted, Crystal Lagoons sent Desert Color a Technology Licensing and Support Agreement ("TLSA"). It is standard that all Crystal Lagoons' customers sign a TLSA, which provides the terms for the customers' license to Crystal Lagoons' cutting-edge technology and intellectual property. Crystal Lagoons will not permit anyone to use its intellectual property, including its trademarks and innovative patented technology, without a signed TLSA.

61.     In June 2019, after months of back and forth between the parties on the TLSA, negotiations came to a halt ostensibly due to disagreements over IP issues related to the TLSA.

62.     On June 24, 2019, Mitchell Dansie from Desert Color contacted Ms. Moore informing her that Desert Color no longer wanted to pursue construction of a lagoon. Mr. Dansie cited high construction and operation costs as Desert Color's reasons for discontinuing the project, although negotiations had been halted for IP issues. Crystal Lagoons' understanding was

that Desert Color was not going forward with a lagoon at the project.

63.     During a follow-up "debriefing" call, held on October 28, 2019, Brook Cole from Desert Color thanked Crystal Lagoons' representatives for all the hard work and time put into developing the project, but reiterated that Desert Color would not be including a lagoon in their development project. Mr. Cole indicated that Desert Color decided not to move forward in large part because its IP counsel would not agree to certain clauses in Crystal Lagoons' TLSA related to protections Crystal Lagoons sought for its intellectual property rights. The conversation ended with Mr. Cole stating that he would reach out to Crystal Lagoons in the future about collaborating on other projects in the pipeline.

64.     It is important to note that discussions and negotiation about the project lasted for more than 18 months, including many phone conversations, site visits to lagoons powered by Crystal Lagoons technology during construction and operation phases, discussion of the economic proposal and license agreement, among others, where Defendant Desert Color was able to gather information about Crystal Lagoons Intellectual Property and technology.

65.     During such time, Crystal Lagoons shared confidential information protected by the signed NDA, including concept designs using Crystal Lagoons' trade dress, details of wall edges and beach access, cost information and details about the systems and equipment used in the technology. Additionally, technical construction methods, which were shared at least during a visit to Windsong Ranch project in Prosper, Texas on March 8, 2019, which has a lagoon using Crystal Lagoons technology. The tour took place at a time when the liner was being applied, so the liner application process, foundation, beach entries, etc. were disclosed to Desert Color, among others.

## CRYSTAL LAGOONS RELATIONSHIP
## WITH DEFENDANT PACIFIC AQUASCAPE

66.     Pacific Aquascape is the entity behind the design, engineering and construction of the man-made lagoon under construction at the Desert Color project, located in St. George, Utah.

67.     Pacific Aquascape also was the entity in charge of the construction of the Hard Rock Hollywood 2-acre man-made lagoon, located at the Hard Rock Seminole project, in Hollywood, Florida. The design and engineering of such lagoon was done by Cloward H2O, a Utah based company mainly involved in the business of conventional swimming pools and water parks.

68.     The lagoon at the Hard Rock Seminole project is currently part of a lawsuit filed October 19, 2019, by Crystal Lagoons against Cloward H2O LLC. Cloward H2O received Crystal Lagoons' confidential and proprietary information illegally from the client and from a Florida project that has a lagoon designed, constructed and operating using Crystal Lagoons' technology.

69.      Upon information and belief, Pacific Aquascape, being the builder of the Hard Rock Seminole lagoon, had access to the detailed plans and engineering prepared by Cloward H2O—based, in large part, on Crystal Lagoons' confidential and proprietary information shared illegally with Cloward H2O—and gained experience in this type of water feature (which is not a conventional swimming pool but a lagoon using Crystal Lagoons' technology).

70.      Such information is being used to replicate the same type of lagoon at the Desert Color project.

## DEFENDANTS DESERT COLOR AND PACIFIC AQUASCAPE USED CRYSTAL LAGOONS' CONFIDENTIAL INFORMATION AND INTELLECTUAL PROPERTY TO DESIGN, CONSTRUCT, PROMOTE AND SELL DESERT COLOR HOMES

71.     In June 2020, Crystal Lagoons was alerted by a vendor who believed it was working on a Crystal Lagoons' project at Desert Color that the Desert Color project was moving forward with a man-made lagoon.

72.     Crystal Lagoons investigated the vendor's claim and discovered that Defendants had, in fact, decided to move forward with a 2.5 acre man-made lagoon, which is currently still being constructed. Specifically, Pacific Aquascape provided the design and engineering of the Desert Color lagoon, and Desert Color and its affiliates, the Builder Defendants, are selling lots and residential facilities that have access to the Desert Color lagoon as part of the Desert Color development.

73.     After having received extensive technical and proprietary information from Crystal Lagoons that directly related to the Desert Color project, and rather than pay Crystal Lagoons for a real Crystal Lagoons lagoon, Desert Color contracted with another company, Pacific Aquascape, to build and commercialize a knock-off lagoon using the innovations, technology, and intellectual property developed by Mr. Fischmann.

74.     Indeed, as one of Desert Color's sales agents put it in a text message with a prospective buyer, Desert Color did not want to work with Crystal Lagoons because "they charge ongoing royalties just to use the name," so instead Desert Color contracted with Pacific Aquascape." (Ex. 7.)

75.     Not satisfied with stealing its technology, Desert Color used Crystal Lagoons' name to pass off its lagoon as one manufactured by Crystal Lagoons!

76.     The Desert Color lagoon has been advertised and marketed as being developed with Crystal Lagoons' technology. This will cause irreparable damage to Crystal Lagoons due to at least the following:

a.  Defendants are selling property to the public based upon a lagoon that is not designed or approved by sanitary authorities for the swimming and bathing uses for which it is being marketed;

b.  Defendants' lagoon poses a significant health risk to the general public, since if the lagoon is not treated with Crystal Lagoons technology, there is a high risk for sanitary accidents as seen in many cases around the world and in the U.S.;

c.  the lagoon is being developed and soon to be delivered to end customers, engaging in an illegal activity; and

d.  if the lagoon is closed by regulatory authorities for not having proper permits, or if swimming and bathing is not allowed, or it has a deficient aesthetics, or if there is any sanitary accidents, then such problems will be immediately associated with Crystal Lagoons, its brand and technology, causing irreparable damage to Crystal Lagoons.

## DESERT COLOR USED CRYSTAL LAGOONS' TRADEMARKS TO ADVERTISE AND PROMOTE DESERT COLOR'S PLANNED WATER FEATURE IN BREACH OF THE NON-DISCLOSURE AGREEMENT AND VIOLATION OF THE LANHAM ACT

77.     Crystal Lagoons also discovered that Desert Color and its affiliates, the Builder Defendants, have been advertising and referring to the planned lagoon as a "Crystal Lagoon" including by using photographs of actual lagoons powered by Crystal Lagoons technology and

comparing the Desert Color lagoon to lagoons built by Crystal Lagoons in other parts of the country.

78.     Examples of Defendants' use of "Crystal Lagoon" are shown below:

**Figure 11: Desert Color brochure available online**
**(http://crepromo.com/pmail/thain/sg_desert_color/SG_Desert%20Color.pdf (last accessed July 29, 2020))**



**Figure 12: Desert Color Brochure available online**
**(http://crepromo.com/pmail/thain/sg_desert_color/ (last accessed July 29, 2020))**



## Project Description

Desert Color is a master-planned community built around a plan of connectivity, community and sustainability. It is a place where you will find the best of everything that Southern Utah has to offer. Located alongside I-15 and Southern Parkway, Desert Color is a comprehensive 3,500-acre mixed-use master planned community. It will feature a variety of primary and secondary residences, shopping, dining, entertainment, commercial, retail, hospitality, and recreational amenities. **Put simply, Southern Utah has never seen a community like Desert Color.**

Desert Color will be guided by a singular plan:
*Desert Color's unique setting creates a special opportunity to blend the natural features of the desert foothills with tried and true community design principles. It emphasizes social connections, open space, recreational diversity, walkable neighborhoods, convenient regional commercial and retail services, hospitality, and offers a variety of residential types and styles.*



More Info



Flyer

## Commercial Hub

Desert Color's mixed-use commercial district will be the central hub and focal point of activity for the community. Its 103-acre design will include vertical mixed use (e.g., offices and residences above retailers) and horizontal mixed use (e.g., retailers, offices, and residences on separate parcels).

The mixed-use commercial district will feature:
- A sports park
- Recreation/entertainment centers
- Health and wellness facilities and services
- A crystal lagoon
- Shopping and dining districts
- Hotels and resorts
- Multi-specialty healthcare clinic
- Open space (e.g., parks, trails, courtyards)
- Access to transportation
- Public use facilities (e.g., 21st-century schools, church, cultural facility, hospital, library, and police and fire station)
- An innovation park for higher education

**Figure 13: Desert Color's Website ([https://desertcolor.com/plans-unveiled/](https://desertcolor.com/plans-unveiled/) (last accessed July 29, 2020))**



**Figure 14: Facebook Post by Sales Agent for Cole West ([https://www.facebook.com/watch/dixiedandotcom/](https://www.facebook.com/watch/dixiedandotcom/) (last accessed July 29, 2020))**



79. When asked directly about Desert Color's affiliation with Crystal Lagoons, one of Builder Defendants' sales agents repeatedly represented that the water feature being built is a Crystal Lagoons' lagoon, as shown below:

**Figure 15: Desert Color Agent mention of Crystal Lagoons**



80. Desert Color's and its affiliates' use of Crystal Lagoons' trademark violates the NDA between Crystal Lagoon and Desert Color.

81. This use of Crystal Lagoons' trademark has injured, and will continue to injure, Crystal Lagoons' reputation and goodwill, which has been carefully and painstakingly built and maintained over the last decade-plus as a result of Crystal Lagoons' dedication to providing only the highest quality products and services and permitting only those parties similarly dedicated to providing such quality and service to use Crystal Lagoons' mark.

82. Developers throughout the United States, and indeed the world, recognize the

Crystal Lagoons® mark as signifying the source of high-quality, highly innovative lagoons, with their white sand beaches and clear blue water reminiscent of a Caribbean beach. The use of Crystal Lagoons' famous mark in association with a lagoon that does not use Crystal Lagoons' innovative technology or meet Crystal Lagoons' standard for quality will dilute the association of that mark with high quality that Crystal Lagoons has worked so hard to establish.

83.     It is important to note that although the negotiations with Desert Color ended around June 2019, Defendants, including Desert Color and affiliates, have continued using Crystal Lagoons trademarks for more than 15 months, including a publication in Desert Color's own website, publications and brochures, sales information, marketing, among others, and therefore has been a reiterated misuse of Crystal Lagoons trademarks from several different persons for many months.

## DEFENDANTS' PLANNED LAGOON INFRINGES CRYSTAL LAGOONS' TRADE DRESS

84.     The planned lagoon at Desert Color is little more than a knock-off of a Crystal Lagoons® lagoon. Thus, it is not surprising that it makes use of Crystal Lagoons' distinctive trade dress.

85.     Indeed, the design submitted with Desert Color's zoning application for its first planned water feature shows nearly all the features of Crystal Lagoons' Trade Dress as shown in the reproduced and annotated figure below:



86.     Upon information and belief, defendants Desert Color and Pacific Aquascape intend to utilize Crystal Lagoons' patented technology, despite not being licensed to do so, in order to create the pristine, clear blue waters that a Crystal Lagoons® lagoon is world-famous for. Upon further information and belief, Desert Color's lagoon will utilize a light-colored, liner-covered bottom, rather than using painted concrete as in standard swimming pools.

87.     Desert Color's design is, in fact, a nearly direct copy of a number of Crystal Lagoons' registered concept designs, all of which utilize Crystal Lagoons' Trade Dress, as can

be seen in the comparisons below with registered designs from Crystal Lagoons, registered in Chile with registration numbers 279545, 291063, 237978, 279545, A2020A6416, A2020A4669, A2020A4671, among others:

**Figure 16: Crystal Lagoons' registered designs**







88.     Defendants' use of Crystal Lagoons' Trade Dress has caused and is likely to continue to cause confusion as to the source or origin of Defendants' lagoon. In June of 2020, a vendor was actually confused, informing Crystal Lagoons that they were working on a Crystal Lagoons' project with Desert Color.

## DESERT COLOR USED CRYSTAL LAGOONS' IMAGES TO MISREPRESENT THE SOURCE AND QUALITY OF THE LAGOON

89.     Crystal Lagoons uses images of its innovative and breathtaking lagoons to advertise and promote its business throughout the world.

90.     In a publicly filed zoning application, Desert Color copied three such images owned by Crystal Lagoons (shown below circled in red) and presented them as representative of the lagoon being built by Desert Color.

**Figure 17: Zoning application excerpt including an image from Crystal Lagoons and showing the lagoon at the Diamante Project at Cabo San Lucas, Mexico, using Crystal Lagoons technology**



**Figure 18: Zoning application excerpt include two images from Crystal Lagoons, for lagoons with Crystal Lagoons technology at projects in Argentina and Mexico.**



91.   Despite the fact that the Desert Color lagoon designed and being built by Pacific

Aquascape will not achieve the same quality of crystal-clear, sparkling, blue waters without

using Crystal Lagoons' patented technology, which neither Desert Color nor Pacific Aquascape have license to use, by using Crystal Lagoons' images Desert Color and Pacific Aquascape have represented, falsely, that their planned project will be of the same high quality as a Crystal Lagoons® lagoon.

92.     Upon information and belief, Pacific Aquascape, the contractor in charge of the design and construction of the Desert Color lagoon, is not able to provide the same quality of water as Crystal Lagoons and has a greenish tonality most of the time, as can be seen in the pictures below, taken at the Seminole Hard Rock Hotel & Casino in Hollywood, FL, during warmer weather, which has a lagoon built by Pacific Aquascape.  Pacific Aquascape has previously designed conventional pools and ornamental lakes with natural treatment methods that do not achieve crystal clear conditions as Crystal Lagoons.

**Figure 19: Hard Rock Hollywood Lagoon constructed by Pacific Aquascape**



**Figure 20: Hard Rock Hollywood Lagoon constructed by Pacific Aquascape**

 

## DEFENDANTS HAVE NOT OBTAINED SANITARY PERMITS FOR SWIMMING, DESPITE REPRESENTING TO PROSPECTIVE BUYERS THAT THE WATER FEATURE WILL BE SWIMMABLE AND OF THE SAME QUALITY AS A LAGOON BY CRYSTAL LAGOONS

93.     Crystal Lagoons, given its innovative background and one-of-a-kind technology, has had to work with different regulatory entities throughout the world to be able to classify, build and operate lagoons powered by Crystal Lagoons technology and allow their use for direct contact recreational purposes without needing to comply with conventional swimming pool construction and operation requirements.

94.     Crystal Lagoons has worked for over 7 years in the U.S. with the different health and environmental regulatory agencies across several states in order to create new regulations for the construction and operation of lagoons using Crystal Lagoons' technology, which are different than conventional swimming pool regulations. This process took years, as this concept and technology were an innovation and did not exist before, and therefore no regulations existed for these large man-made lagoons with high transparency and excellent water quality for recreational purposes such as swimming and bathing but also for the practice of water sports at very low building and operation costs.

95.     For example, in Florida, the lagoons using Crystal Lagoons technology are classified as Public Bathing Places, a completely separate definition than swimming pools, with different construction and operation requirements. At the time this regulation was being developed, Florida's former governor, Rick Scott, travelled to Chile and visited the lagoons with Crystal Lagoons' technology. In Texas, since there was no category for these types of lagoons, a new category was created by the Legislature by passing legislation, a process spearheaded by Crystal Lagoons. The result was that in Texas, the lagoons using Crystal Lagoons' technology

are classified as "Artificial Swimming Lagoons," which allow for different construction and operation requirements than swimming pools to still provide a swimmable recreational water body. A similar process was followed in North Carolina, where a new category of "Artificial Swimming Lagoons" was created through legislation since there were no regulations suitable for these large man-made lagoons, also requiring different construction and operation requirements than swimming pools, among others.

96.     States have their own regulatory regime governing bodies of water for recreational use. Title 26, Chapter 15, Section 2 of the Utah Code regulates public swimming pools and bathing beaches. The Southwest Utah Public Health Department (SWUPHD) regulates public swimming pools and bathing beaches under Utah Administrative Code Rule 392-302. Monitoring and enforcement are done by the Environmental Health Division of SWUPHD.

97.     Utah Administrative Code Rule R392-302 governs the Design, Construction and Operation of Public Pools. It establishes minimum standards for the design, construction, operation, and maintenance of public pools and bathing beaches, and provides for the prevention and control of health hazards associated with public pools which are likely to affect public health.

98.     Rule R392-302-3 states that the Rule for swimming pools "does not regulate any body of water larger than 30,000 square feet…<u>for which the design purpose is not swimming, wading, bathing, diving, a water slide splash pool, or children's water play activities.</u>" (emphasis added).

99.     Defendants are selling property to the public based upon a lagoon that is not designed or approved for the uses it is being marketed. Defendants have not requested or received the necessary permits for swimming purposes of the lagoon. The authorities are not

36

regulating or reviewing what is being done on site. Defendants are deceiving the purchasing public, since the lagoon is being marketed as allowing swimming.

100.    A Freedom of Information Request ("FOIR") to SWUPHD seeking any permits or information relating to the Desert Color project was filed. (Ex. 8). On July 6, 2020, this request was rejected on the grounds that "no records specified by the requestor" existed. (Ex. 9).

101.    The person requesting the FOIR followed up on the request via telephone and spoke with Clint Frye and Jeremy Rogers of the Environmental Health Division of SWUPHD. Mr. Frye and Mr. Rogers referred to the Desert Color lagoon as a "duck pond" and both stated that the "duck ponds" being built would fall under the Utah EPA's recreational body guidance per DEQ R.317-2, because the builder had represented that they were over 30,000 square feet and ***would not be used for swimming***. The only design plan that either Mr. Frye or Mr. Rogers had seen seeking approval was for a typical swimming pool which is another water feature of the Desert Color project and that is on the vicinity of the lagoon, as it can be seen below.

**Figure 21: Desert Color Conventional Swimming Pool (different and separate from the lagoon)**



102.    Notwithstanding what Desert Color, Pacific Aquascape, or its representatives represented to the Environment Health Division of SWUPHD, <u>Defendants are advertising and promoting the planned water feature as a swimmable body of water</u>, as can be seen in the numerous communications between Defendants' agents and prospective buyers reproduced below:

**Figure 22: Conversation confirming the Desert Color lagoon will be used for swimming**



**Figure 23: Conversations confirming the Desert Color lagoon will be used for swimming**



**Figure 24: Conversations confirming the Desert Color lagoon will be used for swimming**



103.    Because of the misrepresentation, upon information and belief, the lagoon designed and being built by Pacific Aquascape and being commercialized by Desert Color and its affiliates, the Builder Defendants, will not be regulated or monitored by the state to ensure that it is healthy for human swimming or bathing activities. And yet, Defendants' agents are representing to buyers that the water feature will be safe for swimming and all manner of water activities.

104.    Defendants' misrepresentations to prospective buyers are dangerous to the public health.

105.    There have been many cases of sanitary accidents around the world in confined

large water bodies (that do not have an appropriate water technology), with fatal outcomes. An emblematic case is the one at Disney's River Country and the one at the National Whitewater Rafting Center in North Carolina, with fatal results due to microorganisms present in the water such as Naegleria Fowleri. These amoebas are particularly dangerous when the bottom sediment re-suspends into the surface and they enter the human organism through the nose, which is an even more important risk in water bodies with water movement.

106.    Crystal Lagoons technology has a track record of over 15 years with optimum sanitary results and more than 45 lagoons operating around the world in different types of climate conditions. The patented water treatment technology is designed to not only maintain microbiological levels according to direct contact regulations for recreational purposes, but also to control microorganisms such as protozoa and amoebas, which include the amoeba Naegleria Fowleri (commonly referred to as the "brain-eating amoeba").

107.    The only technology that exists in the world for large water bodies used for recreational purposes, that is not conventional swimming pool technology applied in large water volumes, is the Crystal Lagoons technology.

108.    Therefore, regarding the treatment of confined large water bodies, it's important to highlight that if such water bodies are not treated with conventional swimming pool technology, or Crystal Lagoons technology, there is a high risk for sanitary accidents.

109.    Defendants' misrepresentations are also, when combined with Defendants' continued use of Crystal Lagoons' trademarks, injurious to Crystal Lagoons. Defendants are creating an association between their unregulated, and possibly dangerous, water feature, and Crystal Lagoons' reputation for high quality, clean, and sanitary man-made lagoons.

110.    Therefore, either the customers are being lied to by Defendants (saying that the

lagoon will be for swimming), or the lagoon will not have sanitary regulations and will not be approved nor overseen by sanitary entities, which poses serious health threats to consumers.

111.    All of the aforementioned actions are not simple mistakes or errors. Defendant Desert Color intentionally gathered information about Crystal Lagoons under confidentiality agreements, and then Desert Color and associates began marketing a swimmable lagoon to consumers without proper sanitary permits and using Crystal Lagoons' trademark, making reference to Crystal Lagoons' website, and using Crystal Lagoons' images and designs, among others.

## COUNT I – BREACH OF CONTRACT AGAINST DESERT COLOR AND THE BUILDER DEFENDANTS

112.    Crystal Lagoons incorporates Paragraphs 1-111 by reference as if set forth fully as part of this count.

113.    The NDA entered into by Crystal Lagoons and Desert Color is a valid contract, binding on both signing parties and their "affiliates, successors, and assigns."

114.    Crystal Lagoons has abided by all terms of the NDA.

115.    Desert Color and its affiliates, the Builder Defendants, have breached the NDA by: (1) upon information and belief, disclosing designs, plans, technical information and other Confidential Information belonging to Crystal Lagoons to Pacific Aquascape; and (2) using Crystal Lagoons' trademarks without written permission.

116.    Crystal Lagoons has suffered damages, in an amount to be determined at trial, as a result of this breach.

117.    Crystal Lagoons will continue to suffer damage unless Desert Color and the Builder Defendants are enjoined from continuing to breach the NDA.

43

## COUNT II – TRADEMARK INFRINGEMENT AGAINST DESERT COLOR AND THE BUILDER DEFENDANTS UNDER 15 U.S.C. § 1114

118.    Crystal Lagoons incorporates Paragraphs 1-111 by reference as if set forth fully as part of this count.

119.    Crystal Lagoons owns multiple valid U.S. Trademark registrations for marks consisting of or containing "Crystal Lagoons" for products and services related to the construction, maintenance, and promotion of man-made bodies of water.

120.    Desert Color and its affiliates, the Builder Defendants, have been using Crystal Lagoons' marks to refer to the knock-off lagoon being built at Desert Color.

121.    This use of Crystal Lagoons' mark has caused actual confusion as to the source of the Desert Color lagoon and is likely to cause continued confusion in the future.

122.    Crystal Lagoons has suffered damages, including at least a need to undertake corrective advertising to mitigate the effect of the false association between Crystal Lagoons® and the Desert Color lagoon, in an amount to be determined at trial, as a result of the unauthorized use of its marks.

123.    Crystal Lagoons will continue to suffer damage unless Desert Color and the Builder Defendants are enjoined from continuing to infringe upon its trademark rights.

## COUNT III – TRADEMARK DILUTION AGAINST DESERT COLOR AND THE BUILDER DEFENDANTS UNDER 15 U.S.C. § 1125(c)

124.    Crystal Lagoons incorporates Paragraphs 1-111 by reference as if set forth fully as part of this count.

125.    The Crystal Lagoons mark is distinctive and widely recognized by the relevant

consuming public as a designation of source of innovative and breathtaking man-made lagoons resembling tropical seas.

126.    Desert Color's and the Builder Defendants' use of the mark started well after Crystal Lagoons' reputation and the fame of its mark was established.

127.    Desert Color and the Builder Defendants have used Crystal Lagoons' mark in advertising and promotional materials published online and in commercial communications with prospective buyers both inside and outside of Utah.

128.    Such use is likely to dilute or diminish the prestige, reputation, and goodwill associated with Crystal Lagoons' mark, which Crystal Lagoons has carefully and painstakingly developed for over a decade.

129.    Crystal Lagoons has suffered damages, including at least a need to undertake corrective advertising to mitigate the effect of the false association between Crystal Lagoons® and the Desert Color lagoon, in an amount to be determined at trial, as a result of this dilution.

130.    Crystal Lagoons will continue to suffer damage unless Desert Color and the Builder Defendants are enjoined from continuing to infringe upon its trademark rights.

## COUNT IV – FEDERAL UNFAIR COMPETITION AGAINST DESERT COLOR AND THE BUILDER DEFENDANTS UNDER 15 U.S.C. § 1125(a)

131.    Crystal Lagoons incorporates Paragraphs 1-111 by reference as if set forth fully as part of this count.

132.    Crystal Lagoons owns a protectable interest in the trademarks it has been using throughout the United States and the world for over a decade.

133.    Desert Color and the Builder Defendants have been using Crystal Lagoons' marks to refer to the knock-off lagoon being built at Desert Color.

134.    This use of Crystal Lagoons' mark has caused actual confusion as to the source of the Desert Color lagoon and is likely to cause continued confusion in the future.

135.    Crystal Lagoons has suffered damages, including at least a need to undertake corrective advertising to mitigate the effect of the false association between Crystal Lagoons® and the Desert Color lagoon, in an amount to be determined at trial, as a result of the unauthorized use of its marks.

136.    Crystal Lagoons will continue to suffer damage unless Desert Color and the Builder Defendants are enjoined from continuing to infringe upon its trademark rights.

## COUNT V – FEDERAL FALSE ADVERTISING UNDER 15 U.S.C. § 1125(a) AGAINST ALL DEFENDANTS

137.    Crystal Lagoons incorporates Paragraphs 1-111 by reference as if set forth fully as part of this count.

138.    Defendants' association of its man-made bodies of water with the phrase "Crystal Lagoon" and its attempt to otherwise associate its products with Crystal Lagoons, constitutes a false or misleading representation of fact regarding the source of its products.

139.    Defendants also misrepresented to the Environment Health Division of SWUPHD that the lagoon for the Desert Color project was not going to be used for swimming, yet Defendants are nonetheless advertising and promoting the planned lagoon as a swimmable body of water to the determent of the public.

140.    Defendants' use of false or misleading representations of fact in commercial advertising or promotion misrepresents the nature, characteristics, or qualities of Defendants' goods.

141.    Defendants' use of false or misleading representations of fact has the tendency to

46

deceive a substantial portion of the target consumer audience, or actually deceives the target consumers.

142.   Defendants' false or misleading representations of fact are material because they are likely to influence the purchasing decision of the target consumers.

143.   Defendants' falsely or misleadingly represented products are advertised, promoted, sold and distributed in interstate commerce.

144.   Crystal Lagoons has been and continues to be injured by Defendants' false or misleading representations of fact through the diversion of sales or loss of goodwill.

145.   Defendants know that its representations of fact are false or misleading.

146.   Defendants' false or misleading representations of fact were done with bad faith and malice or reckless indifference to Crystal Lagoon's and consumers' interests.

147.   Defendants' bad faith false or misleading representations of fact regarding the source of its products makes this an exceptional case within the meaning of 15 U.S.C. § 1117.

148.   Defendants continue to make false or misleading representations of fact regarding the patented status of their products and will continue to do so unless enjoined by this Court as provided by 15 U.S.C. § 1116.

149.   Crystal Lagoons is entitled to an award of damages in an amount to be determined at trial which is to including an award of Defendants' profits due to sales of the falsely or misleadingly represented products, any damages sustained by Crystal Lagoons, the costs of corrective advertising, and the costs of the action, pursuant to 15 U.S.C. § 1117.

## COUNT VI – TRADE DRESS INFRINGEMENT AGAINST ALL DEFENDANTS

150.   Crystal Lagoons incorporates Paragraphs 1-111 by reference as if set forth fully as

part of this count.

151.    Crystal Lagoons owns trade dress rights in its man-made bodies of water. The unique features of Crystal Lagoons' man-made lagoons have acquired distinctiveness and have created a secondary meaning associated with the look and feel of the lagoons.

152.    Customers recognize that a project is developed with Crystal Lagoons technology without necessarily having to see the Crystal Lagoons trademark anywhere on the premises.

153.    Defendants have been using Crystal Lagoons' trade dress in the construction, maintenance, and promotion of man-made bodies of water.

154.    Defendants' use of Crystal Lagoons' trade dress has caused actual confusion as to the source of Defendants' lagoon and is likely to cause continued confusion in the future.

155.    Crystal Lagoons has suffered damages, in an amount to be determined at trial, as a result of Defendants' use of its trade dress.

156.    Crystal Lagoons will continue to suffer damage unless Defendants are enjoined from continuing to infringe upon its trade dress rights.

## COUNT VII – VIOLATION OF THE UTAH TRUTH IN ADVERTISING ACT §13-11a-3(1) AGAINST ALL DEFENDANTS

157.    Crystal Lagoons incorporates Paragraphs 1-111 by reference as if set forth fully as part of this count.

158.    Defendants' association of their man-made bodies of water with the phrase "Crystal Lagoon" constitutes a misrepresentation of fact regarding its products.

159.    Defendants also misrepresented to the Environment Health Division of SWUPHD that the water feature for the Desert Color project was not going to be used for swimming, yet Defendants are nonetheless advertising and promoting the planned lagoon as a swimmable body

of water to the determent of the public.

160.   Defendants know that their representations of fact are false and misleading.

161.   Defendants' misrepresentations are calculated to deceive consumers under the ordinary conditions which prevail in the commercial water feature trade.

162.   Defendants' false or misleading representations of fact will have the natural and probable result of deceiving a portion of the target consumer audience as to the source, sponsorship, approval, or certification of goods or services.

163.   Defendants' false or misleading representations of fact will have the natural and probable result of deceiving a portion of the target consumer audience as Defendants are representing their goods or services have sponsorship, approval, characteristics, or qualities that Defendants' good or services do not have.

164.   Defendants' false or misleading representations of fact will have the natural and probable result of deceiving a portion of the target consumer audience as Defendants' are representing their goods or services are of a particular standard, quality, or grade when they are not.

165.   Crystal Lagoons and the consuming public have been and will continue to be injured (both economically and potentially physically) by Defendants' false or misleading representations of fact through the diversion of sales or loss of goodwill.

166.   Defendants' false or misleading representations of fact were done with bad faith and malice or reckless indifference to Crystal Lagoons' and consumers' interests.

167.   Crystal Lagoons has suffered damages, including at least a need to undertake corrective advertising to mitigate the effect of the false association between Crystal Lagoons® and Defendants' lagoon, in an amount to be determined at trial, as a result of Defendants' false

or misleading representations.

168.     Crystal Lagoons will continue to suffer damage unless Defendants are enjoined from continuing to make these and similar false and misleading representations.

## COUNT VIII – COMMON LAW UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

169.     Crystal Lagoons incorporates Paragraphs 1-111 by reference as if set forth fully as part of this count.

170.     Crystal Lagoons conferred a benefit on Defendants in the form of designs, plans, technical information and other Confidential Information owned by Crystal Lagoons that was shared with Desert Color and its affiliates under the NDA.

171.     Defendants were aware of and accepted the benefit conferred by Crystal Lagoons.

172.     Rather than pay the fair price for Crystal Lagoons' innovative technology and know-how, Desert Color contracted with Pacific Aquascape to design, build, and commercialize a knock-off lagoon using Crystal Lagoons' designs and plans as at least a starting point. It would be unjust to permit Defendants to benefit from this information and know-how without compensating Crystal Lagoons, in an amount to be determined at trial.

## COUNT IX –TRADEMARK INFRINGEMENT UTAH CODE ANN. § 70-3-15 DESERT COLOR AND THE BUILDER DEFENDANTS

173.     Crystal Lagoons incorporates Paragraphs 1-111 by reference as if set forth fully as part of this count.

174.     The marks "Crystal Lagoons" and "Crystal Lagoon" have developed a reputation and goodwill for Crystal Lagoons business and its products or services, and through time,

money, and effort, the words have acquired secondary meaning for products and services related to the construction, maintenance, and promotion of man-made bodies of water.

175.    Desert Color and its affiliates, the Builder Defendants, have been using the Crystal Lagoons' mark in way that is sufficiently similar to Crystal Lagoons' use of the mark to produce confusion among the public consuming these goods and services.

176.    This use of Crystal Lagoons' mark has caused actual confusion as to the source of the Desert Color lagoon and is likely to cause continued confusion in the future.

177.    Crystal Lagoons has suffered damages, including at least a need to undertake corrective advertising to mitigate the effect of the false association between Crystal Lagoons® and the Desert Color lagoon, in an amount to be determined at trial, as a result of the unauthorized use of its marks.

178.    Crystal Lagoons will continue to suffer damage unless Desert Color and the Builder Defendants are enjoined from continuing to infringe upon its trademark rights.

## COUNT X –COMMON LAW UNFAIR COMPETITION ALL DEFENDANTS

179.    Crystal Lagoons incorporates Paragraphs 1-111 by reference as if set forth fully as part of this count.

180.    Crystal Lagoons' name and products have a reputation for excellent quality and service through Crystal Lagoons' expenditure of time, money, and effort, for products and services related to the construction, maintenance, and promotion of man-made bodies of water.

181.    Defendants have been engaged in a scheme to have their goods or services "pass" in the marketplace as those of the Crystal Lagoons' to the consuming public of these goods and services.

182.    Defendants have seized for their own benefit the value Crystal Lagoons has built up through time, money, or effort, which is then generally used to compete against Plaintiff.

183.    Crystal Lagoons has suffered damages, including at least a need to undertake corrective advertising to mitigate the effect of the false association between Crystal Lagoons® and the lagoon designed, constructed and commercialized by Defendants, in an amount to be determined at trial, as a result of Defendants' misuse of Crystal Lagoons' goodwill in its name and products.

184.    Crystal Lagoons will continue to suffer damage unless Defendants are enjoined from continuing to infringe upon its goodwill in its name and products.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, based on the foregoing allegations and claims, Crystal Lagoons requests the following relief and prays that the Court award its judgment against Defendants jointly and severally:

a.      For compensatory damages in an amount to be determined at trial;

b.      For exemplary and punitive damages in an amount to be determined at trial;

c.      For an injunction enjoining and restraining Defendants, their officers, directors, agents, servants, employees, attorneys, and all others acting under or through it from further use of Crystal Lagoons' Intellectual Property including but not limited to its trademarks, trade dress, copyrights, as well as enjoin them from any further representations regarding any association with Crystal Lagoons.

d.      For corrective advertising;

e.      For reasonable costs and attorney's fees;

f.      For pre- and post-judgment interest at the maximum legal rate;

g.      Such other and further relief as this Court may deem just and equitable.

## **DEMAND FOR JURY TRIAL**

Crystal Lagoons hereby demands that all issues so triable be determined by jury.

Respectfully submitted,

Date: December 3, 2020                By:  */s/ Stephen M. Sansom*

Stephen M. Sansom
Brandon T. Christensen
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT  84101
Tel: (801) 799-5897

Anthony R. Zeuli *(Pro Hac Vice pending)*
Thomas Johnson *(Pro Hac Vice pending)*
MERCHANT GOULD P.C.
2200 Fifth Street Towers
150 South Fifth Street
Minneapolis, MN 55402-4247
Tel: (612) 332-5300
Fax: (612) 332-9081

*Counsel for Plaintiffs*
*Crystal Lagoons US Corp and Crystal Lagoons*
*Technologies, Inc.*

15812400_v1